UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAVID J. CLARK,

        Plaintiff,

        v.                      Case No. 04-C-1031

CAROLYN JOHNSON,
RONALD MOLNAR, and
MICHAEL WOODY,

        Defendants.

---

ORDER

        Plaintiff David J. Clark is a Wisconsin state prisoner. He filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 and is proceeding on an Eighth Amendment failure to protect claim against defendants Carolyn Johnson, Ronald Molnar, and Michael Woody. The defendants have filed a motion for summary judgment and the plaintiff has filed a cross-motion for summary judgment. These motions are ready for resolution and will be addressed herein.

FACTUAL BACKGROUND

        On October 21, 2004, the plaintiff filed the complaint and paid the filing fee. The complaint was screened pursuant to 28 U.S.C. § 1915A which states in relevant part that the court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally frivolous, malicious, that fail to

state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. The plaintiff, who was incarcerated at the Racine Correctional Institution (RCI) at all times relevant to this action, was allowed to proceed on an Eighth Amendment failure to protect claim based on allegations that he was injured by his cell mate and that the defendants did not take sufficient action to prevent this occurrence.

On January 12, 2005, the defendants filed a motion for summary judgment along with a motion to stay discovery. The plaintiff filed a response to the defendants' motion and a cross-motion for summary judgment on February 14, 2005. The defendants filed their reply on March 11, 2005, along with a response to the plaintiff's cross-motion for summary judgment.

Discovery was stayed pending resolution of the parties' dispositive motions. (Order of May 10, 2005.)

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61

(E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial— (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law—is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c),] an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower the court to enter judgment as it sees fit. *See* 10A Charles Alan Wright et al. § 2720 at 327-28 (3d ed. 1998). The court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957). Cross motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial which would be helpful in the disposition of the case. *See M. Snower & Co. v. United States*, 140 F.2d 367 (7th Cir. 1944). The proper procedure is to assess the merits of each summary judgment motion independently. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law.

The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright et al. § 2720 at 335.

## FACTS

### I. Introduction

This section is taken from the Defendants' Proposed Findings of Fact and Conclusions of Law, the Plaintiff's Statement of Disputed Facts (which for the most part is a response to the defendants' proposed facts), and the Plaintiff's Additional Factual Propositions and Proposed Conclusions of Law. Facts are also taken from the plaintiff's sworn complaint. *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).

The first portion of this section deals with the defendants' proposed findings of fact. The Plaintiff's Statement of Disputed Facts purports to dispute several of the defendants' proposed findings of facts. These disputes are set forth in footnotes corresponding to the proposed facts. For the most, the plaintiff's disputes are not material. The second portion of this section deals with the Plaintiff's Additional Factual Propositions.

## II. Defendants' Facts

A.  Defendant Carolyn Johnson

At all times relevant to this action, defendant Carolyn Johnson was employed by the Wisconsin Department of Corrections (DOC) as the Corrections Unit Supervisor in charge of the Dane Unit at the Racine Correctional Institution. (Affidavit of Carolyn Johnson [Johnson Aff.] ¶ 2.)  In her capacity as a Corrections Unit Supervisor, defendant Johnson's duties included being responsible for the security, treatment, and general living conditions of all inmates assigned within the Dane Unit.  (Johnson Aff. ¶ 3.)  She also assisted in the development, implementation, and monitoring of overall institution goals, policies, and procedures as part of the institution management team.  *Id.*

On or about March 17, 2004, the plaintiff was housed at RCI in the Dane Unit where he complained about his cell mate, Inmate Fowler, who wanted the plaintiff to stop typing and reading late at night.[1]  (Johnson Aff. ¶ 4.) Defendant Johnson spoke with Fowler about the plaintiff's complaints.  (Johnson Aff. ¶ 5.)  Fowler and the plaintiff had many similarities to their stories.  *Id.* Fowler agreed that he and the plaintiff argued about the plaintiff's typing and reading late at night in the cell.  *Id.*  Fowler had an early morning job on another

---

[1] The plaintiff avers that his earlier roommate problem was not merely a disagreement but rather was a "severe threat."  (Affidavit of David J. Clark [Clark Aff.] ¶ 4; Compl. ¶ 1.)

housing unit that had him gone from the cell virtually all day, every day.[2]  *Id.*
Fowler requested the plaintiff to do his typing and reading during the hours when
Fowler was gone.  *Id.*

Defendant Johnson found Fowler and his requests to be reasonable
and spoke with the plaintiff about his role in being a good cell mate.  (Johnson
Aff. ¶ 6.)  The plaintiff had limited scheduled activities throughout the day and
needed to be more considerate to his cell mate's work schedule.  *Id.*  No further
problems were reported regarding these two inmates.  *Id.*  Defendant Johnson does
not recall ever receiving any complaints from the plaintiff about his cell mates
other than the one discussed above between him and Fowler.  (Johnson Aff. ¶ 7.)

On or about March 29, 2004, the plaintiff requested transfer
consideration to the Dodge Unit as he was unhappy with his living situation on
the Dane Unit.  (Johnson Aff. ¶ 9.)  The plaintiff submitted an
"Interview/Information Request" form which states in full:

> Staff:
>
> 1) Two of my last three TV Guides have come up
> missing from staff desk and today CO Bero blushed
> upon my confronting him about the careless pile of mail
> left unattended and my TV Guide missing.  2) I have
> many enemies here (Dane) and am not comfortable with
> regular insults and threats.  3) Staff care nothing of my

---

[2] According to the plaintiff, Fowler was not gone virtually all day, every day.  Rather, his hours
were varied and limited, and he had two days off every week.  (Clark Aff. ¶ 3.)

> mental disability nor accommodate my deficits. And 4)
> all capitalize on my documented vulnerability and abuse
> me. Move me off Dane to somewhere I may feel safer –
> with equal opportunity (Dodge?).

(Compl. App. B 203.)

The Dodge Unit is for inmates with medical issues/psychological issues that need stabilizing.[3] (Johnson Aff. ¶ 10.) Though defendant Johnson did not have any reason to believe the plaintiff needed placement on Dodge Unit, she forwarded his request to Chief Psychologist Michael Woody, who oversaw the unit at the time. *Id.* The plaintiff was not determined to be appropriate for placement. *Id.*

Defendant Johnson discussed with the plaintiff possible alternate roommate situations. (Johnson Aff. ¶ 11.) She suggested to him that he find someone willing to live with him that he thought he could get along with. *Id.* The plaintiff eventually provided the name of one man who he had met through either a Bible study or church service. *Id.* Upon contacting this individual, he had no interest in living with the plaintiff. *Id.*

On or about May 16, 2004, the plaintiff was housed with inmate Lily. (Johnson Aff. ¶ 8.) The plaintiff and Lily had a dispute that involved the plaintiff throwing a book at Lily and Lily pulling the plaintiff from the top bunk and

---

[3] According to the plaintiff, the Dodge Unit has been used for protection. (Solemn Affirmation of Leo Kaseno [Kaseno Aff.] ¶ 5; Solemn Affirmation of James Thorpe [Thorpe Aff.] ¶¶ 6-7.)

breaking the plaintiff's arm. *Id.* Defendant Johnson never received any complaints from the plaintiff regarding his cell mate, Lily.

Defendant Johnson has no recollection and there is no documentation to support that the plaintiff was being harassed and intimidated by other inmates on a daily basis.[4] (Johnson Aff. ¶ 12.) Unit staff received a complaint that the plaintiff's TV Guide magazines were stolen. (Johnson Aff. ¶ 13.) Staff followed up, found the TV Guides, returned them to the plaintiff, and wrote the other inmate a conduct report. *Id.*

Unit staff did receive complaints about the plaintiff staring at others in the showers and addressed this with the plaintiff as he has a history of sex offending. (Johnson Aff. ¶ 14.) The Dane Unit houses one of the DOC's most intensive sex offender programs in the state, plus an Alternative to Revocation Program for Sex Offenders. *Id.* However, being a sex offender did not make the plaintiff a target by other inmates as there were many more sex offenders, other than the plaintiff, who lived on the unit with no difficulties.[5] *Id.*

---

[4] The plaintiff disputes defendant Johnson's assertion that there is no documentation to support that the plaintiff was being harassed and intimidated by other inmates on a daily basis. The plaintiff claims that his March 29, 2004, Interview/Information Request documents that he was being insulted and threatened on a regular basis. (Compl. Appx. B, 203; Clark Aff. ¶ 11.) The plaintiff has also submitted affidavits and solemn affirmation from Brian Matthews, Larry Olson, Leo Kaseno, and Warren Lilly, who were incarcerated at RCI at all times relevant to this action. These inmates aver that the plaintiff was regularly insulted and threatened at RCI. (Matthews Aff. ¶¶ 6-7; Olson Aff. ¶ 3; Kaseno Aff. ¶ 9; Lilly Aff. ¶¶ 4-5.) However, these inmates do not speak to any documentation of the plaintiff being harassed on a daily basis or of defendant Johnson's awareness of such harassment.

[5] According to the plaintiff,

## B. Defendant Michael Woody

Defendant Michael Woody is employed by the DOC as a Psychologist Supervisor at RCI. (Affidavit of Michael Woody [Woody Aff.] ¶ 2.) In his capacity as a Psychologist Supervisor, defendant Woody's duties include being responsible for directing all administration of the Psychological Services Unit at RCI and for the development, administration, and coordination of all clinical programs within the unit, as well as the supervision of staff, provision of direct service, consultation, and support services. (Woody Aff. ¶ 3.)

On or about March 29, 2004, defendant Woody received and read a request by the plaintiff about a TV Guide that was stolen. (Woody Aff. ¶ 4.) Defendant Woody forwarded this request on to defendant Johnson, who was the Unit Supervisor of the Dane Unit at RCI where the plaintiff was housed. *Id.* This was the only correspondence defendant Woody ever received from the plaintiff

---

Somewhere around this time (March, 2004) Clark was asked by Sergeqant Sitarz (not Sgt. Ozlins as stated in ICE Report) if he was behaving inappropriately in the shower ("staring"). Clark denied and briefly explined the likely frustrated-desire and guilt-inspired mis-projected allegations as feeble attacks on his Christian character.

Due to the prevalent false allegations (of "inappropriate behavior") (as above and alluded to in ICE Report) and unfounded labels and accusations by many inmates toward Clark (a constant over the years at every institution based primarily on his rigid spiritual beliefs and lifestyle, meekness, size, good looks, and mental impairments due to head injury), Clark suffers frequent intimidation, threats and harassment (and a history of occasional physical assaults) from same, to which aforesaid roommate has been witness and, upon request, received explanation from Clark.

(Compl. ¶¶ 6-7.)

that talked about enemies or any request for different housing accommodations. (Woody Aff. ¶ 5.) Defendant Woody has not received any further correspondence from the plaintiff requesting a special housing accommodation. *Id.*

Defendant Johnson contacted defendant Woody's staff about the plaintiff's request to be moved from the Dane Unit to the Dodge Unit. (Woody Aff. ¶ 6.) The plaintiff met with a psychologist and psychiatrist at RCI in February and May of 2004 respectively.[6] *Id.* On those occasions, the plaintiff reported his mental functioning to be adequate and he exhibited no symptoms or signs of emotional or mental distress. *Id.* On December 9, 2004, he was seen by a psychologist at his request to be removed from clinical monitoring. *Id.* At that time, he presented with no mental health concerns. *Id.* The psychologist, Christine Apple, reported that, "Indeed, Mr. Clark denied having any symptoms and did not display any signs of mental illness such as disturbance of mood/affect, formal thought disorder, dysregulated attention, memory, or concentration, pervasive developmental disorder, or thoughts of self/other harm." *Id.* The plaintiff's mental health classification was changed at that time to reflect no current mental health need.[7] *Id.*

---

[6] The plaintiff avers that he has "never been interviewed for Dodge Unit placement nor seen in response to reported threats or other problems with inmates or unit staff by either Defendant Woody or his subordinates." (Clark Aff. ¶ 27.)

[7] The plaintiff avers:

Despite the documented brain contusion from 1988, the plaintiff demonstrates little to no functional impairments at the present time. (Woody Aff. ¶ 7.) He possesses above average intellectual abilities, with an estimated IQ score of 115 as measured on March 31, 1991. (Woody Aff. ¶ 7.) The plaintiff's reading

---

On February 6, 2004 I met with Dr. Apple in attempt to have my clinical monitoring "need" removed. In her report of this meeting Dr. Apple states: "One issue of note is a [traumatic brain injury] in 1988 in which impulsivity and executive compromise is a long term consequence." (Ex.A) And in parting, as I persisted in conversation, she commented on my impulsivity and perseveration in acknowledgment of my brain injury. (Ex.B).

(Clark Aff. ¶ 5.) He further avers:

When I met with Dr. Apple, both on February 6 and December 9, 2004 I generally recall that I did exhibit disability via expressive language latency, attention, concentration and conscious/short-term memory difficulties which impeded my verbal fluency and general communication skills and affect. And on 12/9/04, in response to her question as to thoughts of self/other harm, I specifically recall alluding to such thoughts toward other who abuse me daily . . . but that I have no intention of acting on said thoughts.

(Clark Aff. ¶ 7.)

and math achievement skills were both measured to be at the 12.9 grade level.[8]
*Id.*

The Dodge Unit at RCI is reserved for inmates with significant mental health or medical problems, and if the plaintiff would have been housed there, he could have been a danger to or prey upon his roommates based on above average intellectual functioning along with his history of sex offending. *Id.* Furthermore, the Dodge unit houses four inmates to a cell. *Id.* It was felt that having four inmates to one room would only enhance the problems the plaintiff was allegedly experiencing.[9] *Id.*

---

[8] The plaintiff avers:

I have moderate functional impairments of a permanent nature as a result of my 1988 head injury at age 21 rendering me developmentally disabled with diagnoses and deficits: frontal lobe dysfunction/organic personality syndrome; diffuse left hemisphere brain dysfunction; slowed/limited (information) processing; expressive language latency; psychological vulnerability; impulsivity, perseveration and executive compromise; disinhibition, etc., including contraindications for long-term incarceration and traditional treatment modalities due to lack of treatable disorder, with recommendations for appropriate segregation offerings due to the very high risk of being victimized by predatory inmates, and for further neuropsychological and neuropsychiatric testing to assess my current level of functioning, etc. All is on file with DOC, and some of the above have been rendered by DOC personnel during my incarceration. (Exs.D,E,F,G,H,I,J,A,B.)

(Clark Aff. ¶ 8.)

[9] The plaintiff avers:

It is common RCI inmate knowledge that Dodge Unit has one cell which houses not four inmates but two, with a maximum unit capacity of 30 inmates, whereas the other units have ± 96 mostly double inmate cells, and Dane has ± 40 more cells than all other units, and all cells on Dane houses two inmates – ± 270 inmates.

This was the only time defendant Woody was made aware of the plaintiff's concern with his personal safety as it related to other inmates. (Woody Aff. ¶ 8.) Defendant Woody never received any complaints from the plaintiff regarding his cell mate, Lily, who the plaintiff had a dispute with on May 16, 2004, that involved the plaintiff throwing a book at Lily and Lily pulling the plaintiff from the top bunk and breaking the plaintiff's arm. *Id.*

## C. Defendant Ronald Molnar

Defendant Ronald Molnar is employed by the DOC as the Security Director at RCI. (Affidavit of Ronald Molnar [Molnar Aff.] ¶ 2.) In his capacity as Security Director, defendant Molnar's duties include the development, implementation, and modification of the security program for all areas under the jurisdiction of the institution; interaction with all major institutional program areas to insure security; direct day-to-day security operations; interrelate with DOC authorities in the security areas as well as state and local enforcement entities; assume direction of the institution in the absence of the Warden; and implementation of affirmative action/civil rights compliance plans. (Molnar Aff. ¶ 3.)

After reviewing the allegations made by the plaintiff in his civil complaint, defendant Molnar has no recollection of any of the events the plaintiff

_____

(Clark Aff. ¶ 44.)

alleges he was a part of. (Molnar Aff. ¶ 4.) Defendant Molnar does not recall the plaintiff passing him in the hallway at RCI asking him about a request the plaintiff sent him complaining of a stolen TV Guide and threats being made by other inmates. (Molnar Aff. ¶ 5.) In fact, defendant Molnar has searched his files and found no documentation to show that the plaintiff wrote him about personal safety issues or anything else for that matter. *Id.* If defendant Molnar would have received a request from the plaintiff, he would have sent the request on to his Unit Manager for follow-up, as this would be the Unit Manager's responsibility. *Id.* Furthermore, defendant Molnar never made any disparaging remarks to the plaintiff about being moved back to Waupun, as he always displays respect toward all inmates.[10] (Molnar Aff. ¶ 6.)

### III. Plaintiff's Facts

The plaintiff has submitted 31 additional factual propositions and he contends that these facts further require the denial of the defendants' motion and

---

[10] The plaintiff states that on March 29, 2004, he wrote a request seeking protection and suggesting a move to Dodge Unit, and sent it to defendant Molnar. (Clark Aff. ¶ 11; Compl. ¶¶ 8, 11.) The plaintiff avers:

> On March 30, 2004 another inmate and I passed Defendant Molnar, and after asking him if he was the security director and if he got my request, which I described to him almost verbatim as to threats, vulnerability and suggesting Dodge Unit transfer, he answered that he is the security director and had received the request and stated that I could be moved back to Rock Unit and that Waupun Correctional Institution has a place for people like me – HSC [segregation].

(Clark Aff. ¶ 13.)

support for his cross-motion for summary judgment. The defendants dispute the majority of the proposed facts. However, they also assert that the plaintiff's additional facts are not material and/or irrelevant. *See* Defendants' Response to Plaintiff's Additional Factual Propositions and Proposed Conclusions of Law Contained in His Cross Motion for Summary Judgment.

The plaintiff's additional factual propositions describe either events not relevant to the issue in this case or actions by persons not a party to this case. In short, the plaintiff's facts are not relevant. As such, they will not be set forth here and they will not be considered in resolving the parties' motions.

## DISCUSSION

The defendants contend that they were not deliberately indifferent to the plaintiff because they did not have sufficient notice of imminent danger to him. The defendants further contend that they are protected by qualified immunity from suit because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person in their situation would have known.

The plaintiff contends that the defendants were deliberately indifferent, 1) because they failed to take action when he notified them of a substantial, pervasive risk to his safety; 2) in denying his request for a protected custody transfer; and 3) by their subsequent action. The plaintiff further

contends that the defendants are not protected by qualified immunity because their conduct violates clearly established statutory or constitutional rights of which a reasonable person in their situation would have known.

The Eighth Amendment's Cruel and Unusual Punishment Clause imposes upon prison officials the duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). This duty requires prison officials "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal quotations omitted). To state a failure to protect claim, a plaintiff-inmate must allege that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) defendant-officials acted with "deliberate indifference" to that risk. *Id.* at 834.

To satisfy the first prong of a failure to protect claim, considered the objective prong, a plaintiff must allege "not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious harm might actually occur." *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). A beating suffered at the hands of a fellow inmate "clearly constitutes serious harm." *Id.* The substantial risk standard is "very high;" however, "it is not insurmountable." *Id.* In speaking of the "relative dearth of case law" on the point at which a risk of inmate assault becomes sufficiently

substantial for purposes of a failure to protect claim, the Seventh Circuit recently stated:

> In *Billman v. Indiana Department of Corrections* . . . we suggested that a "substantial risk" could exist where prison officials place a detainee in a cell in which "they know that there is a cobra there or at least that there is a high probability of a cobra there." *Billman*, 56 F.3d at 788. Expanding upon this hypothetical, we found that, similarly, the assignment of a detainee without warning to a cell with an HIV positive inmate with a known "propensity" of raping his cell mates would also constitute a substantial risk. *Id.* In other cases, we have noted that "it is possible to state a claim on the basis of a guard's knowledge that a particular inmate poses a heightened risk of assault to the plaintiff." *Weiss*, 230 F.3d at 1032.
>
> When our cases speak of "substantial risk" that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to detainees with known "propensities" of violence toward a particular individual or class of individuals; to "highly probable" attacks; and to particular detainees who pose a "heightened risk of assault to the plaintiff." Drawn from the particular pronouncements upon which the *Delgado* court formulated its general standard, these, too, are "risks so great that they are almost certain to materialize if nothing is done," and thus are themselves sufficient to establish a "substantial risk."

*Id.* at 911.

To meet the second prong of a failure to protect claim, the subjective prong, a plaintiff must establish his custodian's deliberate indifference to that

Case 2:04-cv-01031-JPS   Filed 09/29/05   Page 18 of 22   Document 51

substantial risk of serious harm. *Id.* at 913. "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 838). Typically, such a claim asserts that a defendant-custodian failed to take protective action after a plaintiff-prisoner complained of a feared threat posed by rival gang members or a specific person. *Brown*, 398 F.3d at 914. However, deliberate indifference in failure to protect claims can also be "predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant is not known in advance of attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim is not known in advance of the attack)." *Id.* at 915.

It is undisputed that the plaintiff suffered a serious harm, a broken arm, at the hands of his cell mate, Inmate Lily, after the plaintiff threw a book at Lily and Lily pulled the plaintiff off of the top bunk. The issue then is whether the defendants were aware that there was a substantial risk to the plaintiff and, if so, whether they were deliberately indifferent to that risk.

The undisputed facts leading up to the incident are as follows. On March 17, 2004, the plaintiff complained to defendant Johnson about his

previous cell mate, inmate Fowler, because Fowler wanted the plaintiff to stop typing and reading late at night. Defendant Johnson spoke with both inmates about the issue and about Fowler's request that the plaintiff do his typing and reading during the hours when Fowler was gone. No further problems were reported regarding these two inmates.

On March 29, 2004, the plaintiff submitted the Interview/Information Request form, in which he reported to staff that two of his TV Guides were missing, that "I have many enemies here (Dane) and am not comfortable with regular insults and threats," that staff did not care about his mental disability, and that "all capitalize on my documented vulnerability and abuse me." (Compl. Appx. B:203.) The plaintiff also requested that he be moved off of the Dane Unit to somewhere he felt safer, like the Dodge Unit. *Id.*

On May 16, 2004, the plaintiff, who by this time was rooming with inmate Lily, had a dispute with inmate Lily. The plaintiff threw a book at Lily and Lily pulled the plaintiff from the top bunk and broke the plaintiff's arm.

According to the defendants, they were unaware of any immediate threat to the plaintiff and they took all reasonable precautions to ensure his safety. Following the plaintiff's March 29, 2004, Interview/Information Request, they located his stolen TV Guide magazines and punished the inmate responsible. Furthermore, defendant Johnson forwarded the plaintiff's transfer request to

defendant Woody, who found a transfer to the Dodge Unit to be unacceptable. In February and May of 2004, the plaintiff met with a psychologist, reported his mental functioning to be adequate, and exhibited no symptoms of emotional or mental distress.

The plaintiff reported problems he was having in the unit in his March 29, 2004, request. As indicated above, these problems were addressed.

There is no indication that any defendant was aware of a threat that the plaintiff faced from his cell mate, inmate Lily. Moreover, as a sex offender on the Dane Unit, the plaintiff was not alone. He was one of many sex offenders on the unit, which houses one of the DOC's most intensive sex offender programs.

It is undisputed that the plaintiff started the physical confrontation by throwing a book at inmate Lily that resulted in his arm being broken. Only after the plaintiff threw the book did Lily respond physically. Holding the defendants accountable for failing to protect the plaintiff because of a physical fight that the plaintiff started is absurd.

The undisputed facts reveal that the defendants were not deliberately indifferent in response to the plaintiff's concerns as set forth in his March 29, 2004, Interview/Information Request. Moreover, the defendants were not aware that the plaintiff faced a substantial risk of serious harm from inmate Lily. The undisputed facts cannot support a claim that the defendants violated the

plaintiff's Eighth Amendment rights. Accordingly, the defendants' motion for summary judgment will be granted.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #22) be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that this action be and the same is herewith DISMISSED with prejudice, together with costs as may be taxed by the clerk of the court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this ___29th___ day of September, 2005.

BY THE COURT:

_s/ J. P. Stadtmueller_____
J. P. Stadtmueller
U.S. District Judge
